## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| PAUL PARSHALL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) Case No. _____ ) |
| v. | ) JURY TRIAL DEMANDED ) |
| VASCULAR SOLUTIONS, INC., JOHN ERB, HOWARD ROOT, MARTIN EMERSON, RICHARD KRAMP, RICHARD NIGON, PAUL O'CONNELL, JORGE SAUCEDO, TELEFLEX INCORPORATED, and VIOLET MERGER SUB INC., | ) CLASS ACTION ) ) ) ) ) ) ) |
| Defendants. | ) ) |

### COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1. This action stems from a proposed transaction announced on December 2, 2016 (the "Proposed Transaction"), pursuant to which Vascular Solutions, Inc. ("Vascular Solutions" or the "Company") will be acquired by Teleflex Incorporated ("Parent") and Violet Merger Sub Inc. ("Merger Sub," and together with Parent, "Teleflex").

512370.1

2. On December 1, 2016, Vascular Solutions' Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, shareholders of Vascular Solutions will receive $56.00 per share in cash.

3. On January 18, 2017, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of

the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.  Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Vascular Solutions common stock.

9.  Defendant Vascular Solutions is a Minnesota corporation and maintains its principal executive office at 6464 Sycamore Court North, Minneapolis, Minnesota 55369.  Vascular Solutions' common stock is traded on the NasdaqGS under the ticker symbol "VASC."

10. Defendant John Erb ("Erb") has served as Chairman of the Board of Vascular Solutions since May 2011 and as a director since October 2002.

11. Defendant Howard Root ("Root") has served as Chief Executive Officer ("CEO") and a director since he co-founded Vascular Solutions in February 1997.

12. Defendant Martin Emerson ("Emerson") has served as a director of Vascular Solutions since May 2010.

13. Defendant Richard Kramp ("Kramp") has served as a director of Vascular Solutions since May 2013.

14. Defendant Richard Nigon ("Nigon") has served as a director of Vascular Solutions since November 2000.

15. Defendant Paul O'Connell ("O'Connell") has served as a director of Vascular Solutions since January 2002.

16. Defendant Jorge Saucedo ("Saucedo") has served as a director of Vascular Solutions since April 2006.

17. The defendants identified in paragraphs 10 through 16 are collectively referred to herein as the "Individual Defendants."

18. Defendant Parent is a Delaware corporation and a party to the Merger Agreement.

19. Defendant Merger Sub is a Minnesota corporation and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

20. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Vascular Solutions (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

21. This action is properly maintainable as a class action.

22. The Class is so numerous that joinder of all members is impracticable. As of December 1, 2016, there were approximately 17,568,445 shares of Vascular Solutions common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

23. Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

24. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the

claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

25. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

26. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company*

27. Vascular Solutions is an innovative medical device company that focuses on developing unique clinical solutions for coronary and peripheral vascular procedures.

28. The Company's product line consists of three major categories: hemostat products, catheter products, and vein products.

29. Vascular Solutions delivers its proprietary and distributed products to interventional cardiologists, interventional radiologists, and vascular surgeons through its direct U.S. sales force and international distributor network.

30. On April 25, 2016, Vascular Solutions issued a press release wherein it

reported its first quarter 2016 results. The Company reported that worldwide revenue increased 14% from the first quarter of 2015 to $39.4 million, which exceeded the top end of the Company's revenue guidance range of $38.0 million to $39.0 million. U.S. revenue increased 17% to $31.6 million, while international revenue increased 3% to $7.8 million. With respect to the results, Individual Defendant Root stated, "Our first quarter results represent a very strong start to what we believe will be our 13th consecutive year of double-digit percentage growth in product sales."

31.     On July 25, 2016, Vascular Solutions issued a press release wherein it reported its second quarter 2016 results. The Company reported that worldwide revenue increased 10% from the second quarter of 2015 to $41.2 million, in the top half of the Company's revenue guidance range of $40.5 million to $41.5 million. U.S. revenue increased 16% to $33.3 million. Additionally, GAAP earnings per diluted share in the second quarter were $0.31, at the top end of the Company's guidance of $0.29 to $0.31, compared to $0.21 in GAAP earnings per diluted share in the second quarter of 2015. With respect to the results, Individual Defendant Root commented:

> We are pleased to report another very strong quarter of revenue and earnings growth[.] We are excited about the steady performance of our business and the continued progress with our pipeline, especially our top-priority long-term development program for RePlas™ freeze-dried plasma in collaboration with the United States Army. Despite the tough quarterly comparison for our top-selling product GuideLiner in Japan due to our distributor's inventory stocking in 2015, we still generated double-digit revenue growth in the quarter and remain on track to deliver our 13th consecutive year of better than 10% revenue growth. With the distractions and expenses of the Short Kit litigation completely behind us, we have now resumed our growth in operating leverage that is built into our business model, and we are filling out our product pipeline to sustain our long term growth.

32. On October 24, 2016, Vascular Solutions issued a press release wherein it reported its third quarter 2016 results. The Company reported that worldwide revenue increased 13% from the third quarter of 2015 to $41.8 million, near the top of the Company's revenue guidance of $41.0 million to $42.0 million. U.S. revenue increased 15% to $33.7 million, while international revenue increased 4% to $8.1 million. GAAP earnings per diluted share during the third quarter were $0.31 compared to GAAP earnings per diluted share in the year-earlier third quarter of $0.16. With respect to the results, Individual Defendant Root commented:

> We are pleased to report another very strong quarter of growth and to set our guidance for sustained double-digit growth throughout 2017[.] Our core strategy of launching multiple clinical specialty products continues to produce excellent financial results. This year will mark Vascular Solutions' 13th consecutive year of double-digit growth in product sales, and we expect 2017 will be our 14th year. As we look at our longer-term prospects, we are excited about the ongoing progress of our approximately 40 projects in various stages of development within our internal R&D pipeline, as well as our top-priority long-term development program for RePlas™ freeze-dried plasma in collaboration with the U.S. Army. Beyond these internal efforts, our strong balance sheet positions us well to benefit from future distribution agreements and tuck-in acquisitions that fit our customer call-points.

*The Preclusive Merger Agreement*

33. On December 1, 2016, the Board caused the Company to enter into the Merger Agreement, pursuant to which Vascular Solutions will be acquired for inadequate consideration.

34. The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the

Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 5.2(a) of the Merger Agreement states:

> (a) During the Pre-Closing Period, except as otherwise specifically provided for in this Section 5.2, the Company agrees that it shall not (and that the Company shall cause each Company Subsidiary and the directors and officers of the Company and the Company Subsidiaries not to), and that it shall use reasonable best efforts to cause its other Representatives not to, directly or indirectly (i) solicit, initiate or knowingly encourage or knowingly facilitate the submission or an announcement of any Company Competing Proposal, (ii) participate in any negotiations regarding, or furnish to any Person any nonpublic information relating to the Company or any Company Subsidiary in connection with any Company Competing Proposal or any proposal or offer that constitutes or could reasonably be expected to lead to a Company Competing Proposal, (iii) engage in discussions with any Person with respect to any Company Competing Proposal or any proposal or offer that constitutes or could reasonably be expected to lead to a Company Competing Proposal, (iv) approve or recommend, propose publicly to approve or recommend, or fail to timely recommend against, any Company Competing Proposal, (v) withdraw, change, amend, modify or qualify, or otherwise propose publicly to withdraw, change, amend, modify or qualify, in a manner adverse to Parent, the Company Board Recommendation, or (vi) enter into any letter of intent or other document or agreement relating to, or any agreement or commitment providing for, any Company Competing Proposal (an "Alternative Acquisition Agreement" and any act described in clauses (iv) and (v) above, a "Company Change of Recommendation"). The Company shall immediately cease, and shall use commercially reasonable efforts to cause its Representatives to immediately cease, any and all existing discussions or negotiations with any parties conducted heretofore with respect to any Company Competing Proposal. The Company shall promptly following the execution of this Agreement inform its Representatives of the Company's obligations under this Section 5.2. For purposes of this Section 5.2, the term "Person" includes any Person or "group," as defined in Section 13(d) of the Exchange Act, other than, with respect to the Company, Parent. The Company and the Company Subsidiaries and the Company's Representatives may in any event (A) seek to clarify and understand the terms and conditions of any bona fide, written Company

Competing Proposal (or amended proposal) that did not result from a material breach of Section 5.2(a) solely to determine whether such Company Competing Proposal constitutes or would reasonably be expected to lead to a Company Superior Proposal and (B) inform a Person that has made a Company Competing Proposal of the provisions of this Section 5.2, in each case, so long as the Company, the Company Subsidiaries and the Company's Representatives otherwise comply with this Section 5.2 in connection therewith. The Company shall not terminate, waive, amend or modify any provision of any standstill or confidentiality agreement to which the Company is a party, in each case, with respect to the submission of any Company Competing Proposal, except to the extent to allow the applicable party to make a confidential Company Competing Proposal to the Company Board.

35. Further, the Company must promptly advise Teleflex of any proposals or inquiries received from other parties. Section 5.2(c) of the Merger Agreement states:

(c) The Company shall notify Parent orally and in writing promptly (but in any event within two (2) days) (i) after receipt of any Company Competing Proposal (or any proposal or offer that constitutes or could reasonably be expected to lead to a Company Competing Proposal), which notice shall include the identity of the Person making such proposal or offer and copies of all proposals, offers and drafts of proposed agreements related thereto, (ii) of any change to the financial or other material terms and conditions of any Company Competing Proposal and the Company shall otherwise keep Parent reasonably informed of the status of any such Company Competing Proposal (including by providing copies of all proposals, offers and drafts of proposed agreements related thereto that have not already been provided pursuant to clause (i) above) and (iii) after receipt of any request for non-public information relating to it or any Company Subsidiary or for access to its or any of the Company Subsidiaries' properties, books or records by any Person in connection with a Company Competing Proposal or a proposal or offer that could reasonably be expected to lead to a Company Competing Proposal. Neither the Company nor any Company Subsidiary shall, after the date of this Agreement, enter into any confidentiality or similar agreement that would prohibit it from providing such information to Parent.

36. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Teleflex a "matching right" with

respect to any "Superior Proposal" made to the Company. Sections 5.2(d) and (e) of the Merger Agreement provide:

> (d) Notwithstanding anything in this Section 5.2 to the contrary, at any time prior to the time the Required Company Shareholder Vote is obtained, the Company Board may make a Company Change of Recommendation (i) in response to a Company Intervening Event, or (ii) a Company Superior Proposal, in each case, if and only if, with respect to each of clauses (i) and (ii), the Company Board has determined in good faith after consultation with the Company's outside legal counsel that the failure to take such action would be inconsistent with the fiduciary duties of the members of the Company Board under applicable Minnesota Law and the Company first complies with Section 5.2(e).
>
> (e) Prior to the Company taking any action permitted (i) under Section 5.2(d)(i), the Company shall provide Parent with four (4) Business Days' prior written notice advising Parent that it intends to effect a Company Change of Recommendation and specifying, in reasonable detail, the reasons therefor (including the material facts and circumstances related to the applicable Company Intervening Event), and during such four (4) Business Day period, (x) the Company shall negotiate, and cause its Representatives to negotiate, with Parent and its Representatives in good faith (to the extent Parent wishes to negotiate) to enable Parent to determine whether to propose revisions to the terms of this Agreement such that it would obviate the need for the Company Board to make a Company Change of Recommendation, (y) the Company shall consider in good faith any proposal by Parent to amend the terms and conditions of this Agreement in a manner that would obviate the need to effect a Company Change of Recommendation and (z) at the end of the four (4) Business Day period described above, and taking into account any changes to this Agreement proposed by Parent to the Company, the Company Board has determined in good faith after consultation with the Company's outside legal counsel that the failure to take such action would be inconsistent with the fiduciary duties of the members of the Company Board under applicable Minnesota Law even if such changes proposed by Parent were given effect or (ii) under Section 5.2(d)(ii), the Company shall provide Parent with four (4) Business Days' prior written notice (it being understood and agreed that any change or amendment to the financial or other material terms and conditions of any Company Competing Proposal shall require the Company to again comply with this Section 5.2(e) and provide a new notice and an additional two (2) Business Day period) advising Parent that the Company Board intends to take such action and

contemporaneously providing to Parent a copy of the Company Superior Proposal, a copy of any proposed agreements for such Company Superior Proposal (including any financing commitments related thereto) (or, in each case, if not provided in writing to the Company or any of its Representatives, a written summary of the terms thereof), and during such five (5) Business Day period (or any subsequent two (2) Business Day period), (x) the Company shall negotiate, and cause its Representatives to negotiate, with Parent and its Representatives in good faith (to the extent Parent wishes to negotiate) to enable Parent to determine whether to propose revisions to the terms of this Agreement or any other agreement related to the Transactions such that such Company Competing Proposal would no longer constitute a Company Superior Proposal, (y) the Company shall consider in good faith any proposal by Parent to amend the terms and conditions of this Agreement or any other agreement related to the Transactions such that such Company Competing Proposal would no longer constitute a Company Superior Proposal and (z) at the end of such five (5) Business Day period, and taking into account any changes to the terms of this Agreement proposed by Parent to the Company, the Company Board has determined in good faith, after consultation with its outside financial advisors and outside legal counsel, that such Company Competing Proposal would continue to constitute a Company Superior Proposal even if such changes proposed by Parent were given effect.

37. Further locking up control of the Company in favor of Teleflex, the Merger Agreement provides for a "termination fee" of $35 million, payable by the Company to Teleflex if the Individual Defendants cause the Company to terminate the Merger Agreement.

38. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

*Inadequate Merger Consideration and Interests of the Company's Officers and Directors*

39. The consideration to be paid to plaintiff and the Class in the Proposed

Transaction is inadequate.

40. Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

41. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

42. Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

43. For example, Individual Defendant Root stands to receive $8,019,133 in connection with the Proposed Transaction. The Company's other named executive officers stand to receive $8,257,688.

*The Proxy Statement Omits Material Information, Rendering It False and Misleading*

44. Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

45. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

46. The Proxy Statement omits material information regarding Vascular Solutions' financial projections and the financial analyses performed by the Company's financial advisor, Guggenheim Securities, LLC ("Guggenheim Securities"), in support of its so-called fairness opinion.

47. For example, with respect to Vascular Solutions' financial projections, the Proxy Statement fails to disclose: (i) product level revenue and cost line items, operating

expense line items including SG&A, and research and development costs; (ii) stock-based compensation; (iii) capital expenditures; (iv) changes in working capital; (v) interest; (vi) taxes; (vii) depreciation and amortization; (viii) expenses related to the Short Kit litigation; and (ix) a reconciliation of GAAP to non-GAAP metrics.

48. With respect to Guggenheim Securities' *Discounted Cash Flow Analyses*, the Proxy Statement fails to disclose the specific inputs and assumptions used to determine the discount rate range of 9.40% to 11.40%, the specific amount of the steady-state terminal year normalized after-tax unlevered free cash flow, as well as a more thorough description of the two-stage terminal/continuing value methodology used, including the number of years assumed for each of the stages, and the inputs and assumptions used to determine the value of the second stage, given that the current description only includes a singular range of perpetuity growth rates applied to a singular terminal value cash flow amount, suggesting a singular terminal value methodology.

49. With respect to Guggenheim Securities' *Selected Publicly Traded Companies Analysis*, the Proxy Statement fails to disclose the individual multiples for the companies observed by Guggenheim Securities in its analysis.

50. With respect to Guggenheim Securities' *Selected Precedent Merger and Acquisition Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples for the transactions observed by Guggenheim Securities in its analysis.

51. When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly

disclosed. Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

52. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for our Board's Recommendation in Favor of the Merger"; (iii) "Certain Vascular Solutions Unaudited Prospective Financial Information"; and (iv) "Opinion of Vascular Solutions' Financial Advisor."

53. Additionally, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

54. Specifically, the Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of Vascular Solutions' officers and directors, including who participated in all such communications.

55. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

56. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i)

"Background of the Merger"; (ii) "Reasons for our Board's Recommendation in Favor of the Merger"; and (iii) "Interests of Vascular Solutions' Directors and Executive Officers in the Merger."

57. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Vascular Solutions' stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Vascular Solutions**

58. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

59. The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Vascular Solutions is liable as the issuer of these statements.

60. The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

61. The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

62. The omissions and false and misleading statements in the Proxy Statement

are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

63. The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

64. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

65. Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Teleflex

66. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

67. The Individual Defendants and Teleflex acted as controlling persons of Vascular Solutions within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Vascular Solutions and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision

...

making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

68. Each of the Individual Defendants and Teleflex was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

69. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Proxy Statement.

70. Teleflex also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

71. By virtue of the foregoing, the Individual Defendants and Teleflex violated Section 20(a) of the 1934 Act.

72. As set forth above, the Individual Defendants and Teleflex had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of

defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.  Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.  In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.  Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.  Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.  Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.  Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: January 27, 2017

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

By: *s/ Gregg M. Fishbein*
Gregg Fishbein (MN Bar #0202009)
Kate M. Baxter-Kauf (MN Bar #392037)
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
gmfishbein@locklaw.com
kmbaxter-kauf@locklaw.com
*Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310

**RM LAW, P.C.**
Richard A. Maniskas
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
(484) 588-5516